YOUNG RADIATOR COMPANY, Plaintiff–Appellant,

v.

The CELOTEX CORPORATION, Defendant and Third–Party Plaintiff–Appellee,

v.

COOLEY AND BORRE & ASSOCIATES, INC., Korndoerfer Construction Company, F.J.A. Christiansen Roofing, Co., Inc., Third–Party Defendants–Appellees.

No. 88–2691.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1989.
Decided Aug. 4, 1989.

Ronald L. Wallenfang, argued, Michael J. Dabertin, Angela Johnson Colbert, Quarles & Brady, Milwaukee, Wis., for Young Radiator Co.

John D. Bird, Jr., Churchill, Duback & Smith, Milwaukee, Wis., for Celotex Corp.

Edward A. Hannan, Godfrey, Trump & Hayes, Milwaukee, Wis., for Cooley and Borre & Associates, Inc.

William W. Ehrke, Prosser, Wiedabach & Quale, Milwaukee, Wis., for F.J.A. Christiansen Roofing Co.

Joseph D. McDevitt, Borgelt, Powell, Peterson & Frauen, Milwaukee, Wis., for Korndoerfer Construction Co.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

This is a diversity action involving a leaky roof. Plaintiff Young Radiator Company ("Young") brought suit against the Celotex Corporation ("Celotex"), the manufacturer of the roofing system at issue, alleging negligent manufacture and defective design of the roof, breach of contract, and breach of warranty. The district court granted summary judgment in favor of Celotex, finding that Young's tort claims were time-barred under the applicable Wisconsin statute of limitations and that there had been no breach of contract or warranty. Young appeals the district court's ruling on the tort and contract claims but does not appeal the warranty ruling. For the reasons stated in this opinion, we reverse the grant of summary judgment on the tort claims, affirm the dismissal of the contract claim, and remand for further proceedings.

In addition, this appeal raises a jurisdictional issue under Fed.R.App.P. 4(a)(3). After being sued by Young, Celotex joined

as third-party defendants the architect, the general contractor, and the roofing subcontractor, seeking contribution from each. These third-party defendants filed motions for summary judgment based on statute of limitations grounds. The district court, having found Young's tort claims against Celotex to be time-barred, granted summary judgment to the third-party defendants as well. Celotex did not file a notice of appeal from that portion of the judgment dismissing its third-party complaint, and, consequently, the third-party defendants have filed motions in this court seeking to be dismissed from the appeal. They assert that in the absence of a timely Rule 4(a)(3) notice of appeal, we lack competency to exercise appellate jurisdiction to reinstate the third-party action. For the reasons stated herein, we grant the motions to dismiss.

## I.

The parties are in agreement as to the following facts. In 1972, Young undertook to construct a new plant at its facilities in Racine, Wisconsin. Cooley & Boore & Associates ("Cooley") served as the architect; Korndoerfer Construction Co., Inc. ("Korndoerfer") was hired as the general contractor; and F.J.A. Christiansen Roofing Co., Inc. ("Christiansen") was the roofing subcontractor. The parties selected for the plant a "Philip Carey" roofing system, manufactured by Celotex.[1]

Christiansen began construction of the roof in June 1973. During the first two years of construction, various problems occurred, such as leaks and "vapor pockets."[2] The architect, general contractor, and roofer met several times to discuss the problems, and Christiansen was instructed

to make repairs as needed. In October 1974, Cooley informed Young that the roof was "not acceptable in its present state due to vapor pockets and will be made acceptable by Korndoerfer's subcontractor in the late spring of 1975 as we need heat to detect the vapor pockets."

On July 29, 1975, Christiansen's president, Donald McNamara, inspected the roof and found that there were over a hundred openings in the roof where heating and cooling equipment was to be installed. On that day, McNamara wrote to Mr. Young (president of Young Radiator) and informed him that the equipment had not been inserted and flashed and that water was freely flowing into the building through the openings. He also advised Young that Korndoerfer had ignored Christiansen's quotations for roof flashing,[3] curbs, and pitch pans. Mr. Young, upset at learning of these problems from the subcontractor, responded with reprimands to Cooley for failing to properly supervise construction and demands that the project be promptly completed.

The permanent roof flashing and curbing were completed by Carlson Roofing of Racine ("Carlson"), and, after some additional remedial work by Korndoerfer, the roof was accepted by Celotex and Young (through Cooley) on November 5, 1975. With the exception of some minor follow-up flashing and curbing work by Carlson in 1976 (invoiced at $27.56 and $426.40), the construction was essentially completed as of that date. On November 13, 1975, Young Radiator was issued the Philip Carey Inspection and Service Contract which was Celotex's repair service agreement.

---

**1.** The Philip Carey Company is a subdivision of Celotex. The composition (and perhaps complexity) of the roofing system is illustrated by the following excerpt from Christiansen's proposal:

> We propose to furnish a roofing system consisting of two one inch layers of Celotherm or Fesco perlite type rigid roof insulation together with a three ply built-up roofing system, in accordance with Philip Carey specification #300. The first layer of roof insulation will be applied to the deck in ribbons of steep asphalt with mechanical fastening of the outside four foot perimeter. The second layer

of insulation will be applied in solid moppings of steep asphalt. We will apply the base sheet and two #30 organic felts in steep asphalt and flood coat with 60 pounds of dead level asphalt and embed therein gravel at the rate of 400 pounds per square.

**2.** A vapor pocket is a blister in which air or other chemical substances are contained.

**3.** Flashing is sheet metal or other material used to cover and seal joints and angles in a roof, such as where a roof comes in contact with a wall.

In 1978, Carlson repaired minor leaks which were invoiced to Young at $88. In 1979, Carlson made repairs invoiced to Young at $745.00 and $145.00. After receiving the $745.00 bill, Young contacted Celotex about the leaks. By letters dated September 7, 1979, and September 14, 1979, Celotex agreed that the leakage problems were covered by the service contract, informed Young that Carlson would make the necessary repairs at Celotex's expense, and assured Young that the roof would be put "in watertight condition." The repairs were made in the spring of 1980, but the roof continued to leak.

Celotex authorized Carlson to make additional repairs in 1980 and 1981, and by letters dated January 16 and October 21, 1981, continued to assure Young that the roof could and would be made watertight. On November 17, 1981, Celotex informed Young by letter that before the repairs could be completed four additional roof drains were needed and that those installations would be at Young's expense as they were not covered by the service agreement. The letter also offered to provide Young with materials to overlay the roof of Young's separate office building. The letter stated that Celotex "must receive a signed release from claims prior to the shipment of materials." Young never responded to this letter.

From 1980 through July 2, 1984, Young spent more than $11,000 on repairs to the plant roof. Thereafter, in 1984, the entire roof was replaced. Young filed this action against Celotex on January 2, 1986, alleging that the roof was negligently manufactured and defectively designed and that Celotex had breached the service agreement.

## II.

### Tort Claims/Statute of Limitations

Wisconsin law provides a six-year limitation period for property injury claims. Wis.Stat. § 893.52 (formerly Wis.Stat.

§ 893.19(5)).[4] Both the district court's opinion and the parties' briefs on appeal analyzed the statute of limitations question according to the following standard, first enunciated in *Tallmadge v. Skyline Construction, Inc.*, 86 Wis.2d 356, 272 N.W.2d 404 (App.1978):

> We hold that a cause of action accrues and the statute of limitations (sec. 893.-19(5), Stats.) begins to run when the evidence of injury to property, resulting from the negligent act upon which the action is based, is sufficiently significant to alert the injured party to the possibility of a defect. The injury need not, however, be of such magnitude as to identify the causal factor.

*Id.* 272 N.W.2d at 405. Applying this standard, the district court found that the evidence of injury to the roof was significantly sufficient before 1980 (the suit was filed on January 2, 1986) to begin the running of the limitation period.

Our independent research revealed, however, that this standard is no longer applicable and has been replaced by the discovery rule announced in *Hansen v. A.H. Robins, Inc.*, 113 Wis.2d 550, 335 N.W.2d 578 (1983). We are perplexed by the omission of the *Hansen* line of cases. To avoid any further confusion, we will trace the development of the law on this issue. We note, however, and as will be discussed below, that even under the *Tallmadge* standard summary judgment was inappropriate.

Prior to the Wisconsin Supreme Court's 1983 decision in *Hansen,* Wisconsin law held that a cause of action in tort accrued on the date of injury. *See, e.g., Boehm v. Wheeler,* 65 Wis.2d 668, 223 N.W.2d 536 (1974) (legal malpractice action accrued on the date plaintiff lost the right to obtain a patent, not on the date plaintiff discovered attorney had failed to file application); *Abramowski v. Kilps Sons Realty, Inc.*, 80 Wis.2d 468, 259 N.W.2d 306 (1977) (negli-

---

**4.** In its motion for summary judgment, Celotex asserted that the current § 893.52 was the applicable statute. On appeal the parties have agreed that the former statute, § 893.19(5), governs this case. Because the statutes are substantially identical, both prescribing a six-year limitation period, the question is academic. However, we note that whether the current or former statute applies is determined by the date on which the cause of action accrued, not, as the parties believed, the date on which construction was completed. *See* Wis.Stat. §§ 990.06, 991.07.

gent construction action accrued on the day the basement walls caved in); *Rod v. Farrell*, 96 Wis.2d 349, 291 N.W.2d 568 (1980) (personal injury action accrued on date of hernia operation when plaintiff was four years old, not twenty years later when plaintiff discovered he was sterile). Despite these sometimes harsh results, Wisconsin courts, for the most part, strictly adhered to the "date of injury" rule. However, in *Tallmadge*, a negligent construction case, the Wisconsin Court of Appeals considered the question of what magnitude of injury is necessary to give rise to a cause of action. Recognizing that an injury might be so slight as to obscure the very fact of injury, the *Tallmadge* court formulated the above-quoted standard. In addition, the court stated that "[o]rdinarily, the question of when such a resulting injury occurred will be a question of fact for the jury." 272 N.W.2d at 405.

Although the court purported that the standard was not a discovery rule but merely a test for identifying an event as an injury, 272 N.W.2d at 405, in practice the standard operated to some degree as a discovery rule. In fact, the *Hansen* Court later referred to the standard, as it was applied in *Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Construction Corp.*, 96 Wis.2d 314, 291 N.W.2d 825 (1980), as a "step in [the] direction" of the discovery rule. 335 N.W.2d at 581. Three cases illustrate the application of *Tallmadge*. In *Wisconsin Natural Gas Co.*, the Wisconsin Supreme Court held that the discovery of one electrical short in an underground pipeline was not sufficiently significant evidence of injury to alert the plaintiff of the possibility of a defect in the pipeline. The court held that the cause of action accrued when a survey disclosed numerous shorts and sections of buckled pipe requiring excavation of the pipeline. In *Kohl v. F.J.A. Christiansen Roofing Co.*, 95 Wis.2d 27, 289 N.W.2d 329 (App.1980), a roof construction case, the court reversed a summa-

ry judgment and held that it was up to the factfinder to determine whether wind uplift damage to 12,000 square feet of a 300,000 square foot roof followed by complaints of rain leakage was sufficiently significant evidence of injury so as to initiate the limitation period. And in *State of Wisconsin v. Holland Plastics Co.*, 111 Wis.2d 497, 331 N.W.2d 320 (1983), another roof construction case, the Wisconsin Supreme Court reversed a grant of summary judgment on statute of limitation grounds, stating that "[t]he determination of when a cause of action accrues under [§ 893.19(5) ] is a factual one." The court found that it could not say as a matter of law that documented roof leakage during construction was sufficient to begin the limitation period.

■ On appeal, Celotex argues that under the *Tallmadge* standard the evidence of roof leakage both during construction (1973–75) and during the late 1970's was so great that Young's cause of action must have accrued prior to 1980. Celotex relies on *Holy Family Catholic Congregation v. Stubenrauch Associates, Inc.*, 136 Wis.2d 515, 402 N.W.2d 382 (App.1987), a roof construction case in which the court held that evidence of leaks occurring one month after construction was completed was sufficient to begin the limitation period. We disagree. First, *Holy Family* was decided under a different statute of limitation which specifically provided that the limitation period would begin to run upon "substantial completion of construction." Wis. Stat. § 893.89.[5] Although the court also held, alternatively, that the action was barred under *Tallmadge*, the analysis of that question is thin. More importantly, however, *Holy Family*, as well as the three cases outlined above, were all negligent construction suits. The instant case, on the other hand, is a products liability action alleging negligent manufacture and defective design which caused premature failure

5. The Wisconsin Supreme Court subsequently held this statute to be unconstitutional on equal protection grounds finding that the statute irrationally protected architects and builders but denied protection to owners, occupants, and tenants. *Funk v. Wollin Silo & Equipment, Inc.*, 148 Wis.2d 59, 435 N.W.2d 244 (1989). The court also recognized a potential problem posed by the statute, *i.e.*, that a litigant might be deprived of a cause of action before it had even accrued. The court found it unnecessary to explore that question, however, because of its decision on equal protection grounds. *Id.* 435 N.W.2d at 252.

of the entire roofing system. Consequently, we find that evidence of leakage during construction—which could be caused by poor workmanship, insufficient flashing, or a number of other construction-related problems—prior to Young's accepting the finished roof, to be of little or no weight in determining when the evidence of *premature roof failure resulting from defective product design and manufacture* was sufficiently significant to begin the limitation period for that cause of action.[6] Setting aside the leakage problems during construction, Young spent less than $1,000 in 1978–79 for roof repairs, during which time Celotex assured Young that the roof could be made watertight. In comparison, from 1980 to 1984 Young spent over $11,000 for roof repairs and finally replaced the entire roof. On this record, we cannot say as a matter of law that the evidence of premature roof failure was sufficient prior to 1980 to start the limitation period under the *Tallmadge* test.

We have taken the time to analyze the facts under *Tallmadge* because discovery of the nature of the injury is a component in the *Hansen* discovery rule. In *Hansen*, a personal injury action involving the Dalkon Shield intrauterine device, the Wisconsin Supreme Court overruled the "date of injury" standard and held that "tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered." 335 N.W.2d at 583. The court subsequently, in *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 388 N.W.2d 140 (1986), fully articulated the rule as follows:

> [U]nder Wisconsin law, a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the

injury was probably caused by the defendant's conduct or product.

> \* \* \* \* \* \*

> [D]iscovery does not occur until there is information available to the claimant of the nature of her injury, the cause of her injury, and the defendant's part in that cause.

*Id.* 388 N.W.2d at 146 and 147. Application of the rule was further explained in *Hammer v. Hammer*, 142 Wis.2d 257, 418 N.W.2d 23 (App.1987), and *Ford Farms, Ltd. v. Wisconsin Electric Power Co.*, 145 Wis.2d 650, 430 N.W.2d 94 (App.1988). *Hammer* explained that the discovery rule is an objective standard to be applied in terms of a reasonable person under the circumstances. 418 N.W.2d at 26 n. 6. And *Ford Farms* made clear that the discovery rule replaced the *Tallmadge* test. 430 N.W.2d at 97. As we have already found that on this record summary judgment was inappropriate under the *Tallmadge* standard, summary judgment would certainly be inappropiate under the more expansive discovery rule.

■ Finally, we suspect that the discovery rule may have been overlooked because it was thought either that the rule did not apply to property injury claims or that *Hansen* could not be applied retroactively. If so, we wish to make clear that property as well as personal injury claims are subject to the discovery rule, *see Hansen*, 335 N.W.2d at 583 ("we adopt the discovery rule for *all tort actions* other than those already governed by a legislatively created discovery rule") (emphasis added); *Ford Farms*, 430 N.W.2d at 97 (discovery rule applied to action for negligent design of electrical system causing financial loss to plaintiff dairy farm); *Milwaukee Area Vocational Technical and*

---

**6.** At oral-argument, the parties vigorously disputed the role of "cause" under the *Tallmadge* test. We note the relevant language: "evidence of injury to property, *resulting from the negligent act upon which the action is based* ... The injury *need not, however, be of such magnitude as to identify the causal factor.*" 272 N.W.2d at 405 (emphasis added). Young asserted that while *discovery* of the cause was not relevant *under the test*, the first underlined clause indicates that *cause in fact* is a necessary component of the standard. Celotex essentially argued that cause was irrelevant. We agree with Young. A hypothetical illustrates the point. Suppose the materials used in a roof are designed so as to disintegrate after 10 years but not before. During construction, leaks caused by poor workmanship are discovered and repaired. The leaks are not evidence of the later disintegration and, thus, would not be evidence of injury "resulting from the negligent act upon which the action is based."

*Adult Education Dist. v. United States Steel Corp.*, 847 F.2d 435 (7th Cir.1988) (discovery rule applied to property damage claim alleging defective product design);[7] and that *Hansen* does apply retroactively, *see Borello*, 388 N.W.2d at 147–51; *Kohnke v. St. Paul Fire and Marine Insurance Co.*, 144 Wis.2d 352, 424 N.W.2d 191, 195 (1988).

### III.

#### Contract Claim

■ The contract question requires less discussion. Young premised its breach of contract claim on the November 17, 1981, letter, wherein Celotex: (1) conditioned the shipment of materials for the office building roof on Young's release of all claims against Celotex for past, present, and future problems with that roof; and (2) requested Young to install four roof drains on the plant roof before Celotex proceeded with repairs. Young alleged that those two points constituted an anticipatory breach of the service agreement on the plant roof, and asserts on appeal that whether there was a breach is a question of fact for a jury. Young's argument is without merit.

As to the first point, both the letter and the attached "General Release" clearly stated that the release of claims pertained only to the *office* building roof. The letter is divided into two captioned sections—"A. Plant Roof" and "B. Office Roof." The release of claims is mentioned only in the office roof section and refers only to the shipment of materials for that roof. Lest there be any doubt, the release itself states

that Young will hold harmless Celotex for any claims "arising out of, or in connection with ... the roof of the Racine Facility Office Building," specifically, obligations arising under "Roofing Bond No. 22299." The service agreement on the plant roof was Roofing Bond No. PC 4077.

As to the second point, the contract states:

> In the event leaks from any cause should occur, owner shall notify Celotex promptly, confirming such notice in writing. Celotex will inspect the roof, and if cause of leak is within the coverage as stated above, Celotex will arrange for repairs to be made at no cost to owner. If cause of leak is not covered, Celotex will not be responsible for cost of any repairs.

The record shows that it was not uncommon for Celotex to determine that certain items were not covered by the service agreement. For example, on September 14, 1979, Celotex informed Young that expansion joint repairs would have to be made at Young's expense. Apparently, Young made those repairs, and Celotex proceeded with the covered repairs. Young did not respond to the November 17, 1981, letter and did not challenge Celotex's determination that roof drains were not covered by the contract. Indeed, it appears from our reading of the contract that installation of additional roof drains would not be covered. In any event, however, Young never claimed that roof drains were covered. Young simply stopped calling Celotex and, four years later, filed a suit for anticipatory breach.

It is well settled under Wisconsin law that "in order to constitute an anticipatory breach of contract (repudiation), there must be a definite and unequivocal manifestation

---

7. In *Milwaukee Area Vo. Tech.*, the plaintiff alleged that the "Cor–Ten weathering steel" used in the construction of the roofs and exterior walls of its buildings became rusted and stained after construction. This court affirmed a summary judgment on statute of limitation grounds, stating that "[i]t does not take a specialist to conclude that, once the problem with the rusting of the CorTen steel was discovered, a significant possibility exists that the problem may be with the steel itself." 847 F.2d at 439. We also stated, referring to *Holy Family*, that "a leaking roof ... will certainly put a plaintiff on notice that it has suffered an injury and of the identity of the allegedly responsible defendant." *Id.* at

439 n. 4. We note that the rusting of the steel panels in that case did, indeed, point to a problem with the steel itself, whereas in the instant case, given the complexity of the roofing system, the problems during construction, the relatively small expenditures for repairs in the 1970's, and the assurances from Celotex that the roof would and could be made watertight, the evidence of injury did not necessarily point to a fundamental design defect. Further, our reference to *Holy Family* was a reference to a negligent construction case which, as discussed above in the text, is distinguishable from the negligent manufacture/defective design action in this case.

of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wisconsin Dairy Fresh v. Steel & Tube Products Co.*, 20 Wis.2d 415, 122 N.W.2d 361, 367 (1963). Young submitted no evidence that Celotex refused to repair covered leaks. On the contrary, Young's plant engineer testified at his deposition that there was never a time that Young asked Celotex to repair leaks and Celotex declined to do so. There is no genuine issue of material fact to be decided, and the district court appropriately granted summary judgment to Celotex on the contract claim.

## IV.

### *Rule 4(a)(3)*

Because we have reversed the dismissal of Young's tort claims, we must determine whether, in the absence of a Rule 4(a)(3) notice of appeal, Celotex may challenge the judgment entered for the third-party defendants. Rule 4(a)(3) gives parties fourteen days within which to file a notice of cross appeal after an initial notice of appeal has been filed. The rule was created to address a problem exemplified in *Whitehead v. American Security & Trust Co.*, 285 F.2d 282 (D.C.Cir.1960). In *Whitehead,* as here, the district court entered judgment for the defendant and for the third-party defendants because they could be liable only if the defendant was liable to the plaintiff. The plaintiff filed a notice of appeal on the day before the expiration of the time period allowed for taking an appeal. Three days later, the defendant filed a notice of appeal from the judgment in favor of the third-party defendants. The court of appeals held that the defendant's notice of appeal was untimely and, therefore, the court was without jurisdiction to review the judgment in favor of the third-party defendants. Rule 4(a)(3) was created to avert this dilemma by providing additional time for the filing of a notice of appeal once the initial notice is filed.

Despite the holding in *Whitehead,* that absent a timely notice of appeal the court was without jurisdiction to review the challenged judgment, there has been a longstanding split in authority among the circuits on whether a Rule 4(a)(3) notice of appeal is a jurisdictional requirement or a rule of practice which can, in appropriate cases, be suspended. Authority for the rule of practice position has its source in the grants of jurisdiction found in Article III and 28 U.S.C. § 1291, both of which speak in terms of *whole cases.* Rule 1(b) underscores the point by providing that "[t]hese rules shall not be construed to extend or limit the jurisdiction of the courts of appeals as established by law." Thus, the rules of appellate procedure do not, in a strict sense, affect the subject matter jurisdiction of the courts of appeals.

However, the rules of appellate procedure have the force of law, 28 U.S.C. § 2072, and Rules 3 and 4 state conditions precedent for the *exercise* of the appellate jurisdiction granted by Article III and 28 U.S.C. § 1291. Although these conditions precedent are spoken of as "mandatory and jurisdictional," *see, e.g., Browder v. Director, Dept. of Corrections of Illinois,* 434 U.S. 257, 265, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978), the more precise effect of the rules is to state the conditions which *invoke* the jurisdiction of the court. *Sanchez v. Board of Regents of Texas Southern University,* 625 F.2d 521, 522 n. 1 (5th Cir.1980); *see also* 9 J. Moore & B. Ward, *Moore's Federal Practice* ¶¶ 204.02[2] at 4–14, 204.11[5] at 4–59 (2d ed. 1989).

█ Against this backdrop, several circuits have held that while a timely Rule 4(a)(1) initial notice of appeal is mandatory and jurisdictional, Rule 4(a)(3), which provides additional time for filing cross or other separate appeals, is a rule of practice which can be suspended. Although the reasoning in specific cases varies, the basic rationale is that the initial notice of appeal invokes jurisdiction over the whole case so that the appellate court has the power to overlook the absence of a 4(a)(3) notice and to reverse or otherwise modify a non-appealed judgment or ruling in order to fully adjudicate the appeal before it. The Third, Fourth, Fifth, Eighth, Ninth, and District of Columbia Circuits have followed or recognized this approach. *See Scott v. University of Delaware,* 601 F.2d 76, 82–84 (3d

Cir.1979); *Rhoads v. Ford Motor Co.*, 514 F.2d 931, 934 (3rd Cir.1975); *LaFaut v. Smith*, 834 F.2d 389, 394 n. 9 (4th Cir.1987); *Tug Raven v. Trexler*, 419 F.2d 536, 548 (4th Cir.1970); *Anthony v. Petroleum Helicopters, Inc.*, 693 F.2d 495, 497–98 (5th Cir.1982); *Kicklighter v. Nails By Jannee, Inc.*, 616 F.2d 734, 742–45 (5th Cir.1980); *United States v. United States Steel Corp.*, 520 F.2d 1043, 1052 (5th Cir.1975); *Hysell v. Iowa Public Service Co.*, 559 F.2d 468, 476–77 (8th Cir.1977); *Chicago, Burlington & Quincy R.R. v. Ready Mixed Concrete Co.*, 487 F.2d 1263, 1268 n. 5 (8th Cir.1973); *Bryant v. Technical Research Co.*, 654 F.2d 1337, 1341–43 (9th Cir.1981); *Freeman v. B & B Associates*, 790 F.2d 145, 151 (D.C.Cir.1986); *Arnold's Hofbrau, Inc. v. George Hyman Construction Co.*, 480 F.2d 1145, 1150 (D.C.Cir.1973).

On the other hand, the Second, Sixth, Seventh, and Tenth Circuits have, for the most part, adhered to the view that Rule 4(a)(3) is a mandatory, jurisdictional requirement. *See Brotherhood of Maintenance of Way Employees v. St. Johnsbury & Lamoille County R.R.*, 806 F.2d 14, 15 (2d Cir.1986); *Zapico v. Bucyrus–Erie Co.*, 579 F.2d 714, 725 (2d Cir.1978); *Akron Center for Reproductive Health v. Slaby*, 854 F.2d 852, 869 (6th Cir.1988), *prob. juris. noted*, —— U.S. ——, 109 S.Ct. 3239, 106 L.Ed.2d 586; *Securities and Exchange Commission v. Youmans*, 729 F.2d 413, 415 (6th Cir.1984); *Ford Motor Credit Co. v. Aetna Casualty and Surety Co.*, 717 F.2d 959, 962 (6th Cir.1983); *Illinois Bell Telephone Co. v. F.C.C.*, 740 F.2d 465, 477 (7th Cir.1984); *Martin v. Hamil*, 608 F.2d 725, 730–31 (7th Cir.1979); *Haffa v. Cooper*, 516 F.2d 931, 933 n. 3 (7th Cir.1975); *Savage v. Cache Valley Dairy Association*, 737 F.2d 887, 888–89 (10th Cir.1984). There are, however, some cross currents in these circuits. *See In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195, 203 (2d Cir.1987) (dicta recognizing rule of practice approach); *United Optical Workers Union Local 408 v. Sterling Optical Co.*, 500 F.2d 220, 224 (2d Cir.1974) (older authority); *In re Barnett*, 124 F.2d 1005 (2d Cir.1942) (older authority); *Pistas v. New England Mutual Life Insurance Co.*, 843 F.2d 1038, 1041 (7th Cir.1988) (dicta suggesting that the question might be open for debate in this circuit); *Daniels v. Gilbreath*, 668 F.2d 477, 480 (10th Cir.1982) (older authority).

Last year, the Supreme Court addressed a related issue. In *Torres v. Oakland Scavenger Co.*, —— U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), a notice of appeal was filed on behalf of sixteen plaintiffs whose complaint had been dismissed under Fed.R.Civ.P. 12(b)(6). Due to a clerical error, the name of one of the sixteen plaintiffs had been omitted from the notice. The Ninth Circuit held that under Fed.R. App.P. 3(c), which provides that a notice of appeal "shall specify the party or parties taking the appeal," the failure to name a party in the notice constitutes a jurisdictional bar to appellate review as to that party. The Supreme Court granted certiorari to resolve a conflict among the circuits, similar to the conflict here, on whether the failure to name a party presents a jurisdictional bar to the appeal or whether the appeal may be permitted in limited instances. *See* 108 S.Ct. at 2407 n. 1. The Court held that the requirements of Rules 3 and 4 are mandatory and jurisdictional and that although the courts of appeals may liberally construe those rules to determine whether they have been complied with, the courts may not waive noncompliance. *Id.* at 2409.

We believe *Torres* controls the issue in this case. While one could argue that the case dealt only with the specificity requirement as applied to an *initial* notice of appeal, we find the broad language in *Torres* to encompass Rule 4(a)(3) as well. Indeed, it could have been argued in *Torres* that the notice of appeal naming fifteen of the sixteen plaintiffs invoked the jurisdiction of the court over the whole case, so that a separate appeal by the sixteenth plaintiff would not be *jurisdictionally* required. Yet the Court's holding made clear that the requirements of Rules 3 and 4 must be satisfied as to each party, and precludes the argument in this case that Celotex's noncompliance with Rule 4(a)(3) can be waived.

Finally, we wish to note that while the *Torres* rule is harsh, even under a rule of

practice approach the circumstances in this case would not warrant a waiver of Rule 4(a)(3). This is not a case where the appealing party (Young) is aligned in interest with the non-appealing party (Celotex) so as to justify viewing Young's appeal as being taken on Celotex's behalf. *See In re Barnett*, 124 F.2d 1005 (2d Cir.1942). Nor is it a case where reversal negates all grounds for recovery against a non-appealing as well an appealing defendant. *See Daniels v. Gilbreath*, 668 F.2d 477, 480 (10th Cir.1982); *Kicklighter v. Nails By Jannee, Inc.*, 616 F.2d 734, 742–45 (5th Cir.1980). Nor is it a case where execution of the judgment in favor of the successful appellant would be frustrated absent a reversal in favor of the non-appealing party. *See In re Barnett; Kicklighter.* Nor is waiver necessary to avoid assessing different liabilities against two joint tortfeasors. *See Hysell v. Iowa Public Service Co.*, 559 F.2d 468, 476–77 (8th Cir.1977) (same date would be used to compute postjudgment interest against appealing and non-appealing defendant). Here, the third-party defendants obtained rights under the district court's judgment in their favor, and those rights cannot be disturbed absent a timely notice of appeal.[8]

## V.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. The third-party defendants' motions to dismiss are granted.

---

8. Celotex makes an ancillary argument in support of its failure to file a notice of appeal. Celotex asserts that the district court did not dismiss its *action* against the third-party defendants but merely dismissed its third-party complaint. Relying on *Benjamin v. United States,* 833 F.2d 669, 671 (7th Cir.1987), Celotex contends that the dismissal did not constitute a final, appealable order. The argument is without merit. *Benjamin* held that the mere dismissal of a complaint does not constitute a final, appealable order unless it is clear that the district court found that the complaint could not be saved by amendment. Here, not only is there no question that the complaint was not amendable, the district court, upon motions based on statute of limitation grounds, granted *summary judgment* to the third-party defendants.